NO CV-30



LODGED
CLERK, U.S. DISTRICT COURT
JUL 1 4 2022
CENTRAL DISTRICT OF CALIFORNIA
BY ⊘ DEPUTY

Jeremaine Robert Cathey
Plaintiff, Pro Se
Address for Service
2435 1/2 Shoredale ave
Los Angeles CA 90031
**wayz2win2022@gmail.com**

**FILED**
CLERK, U.S. DISTRICT COURT

**JUL 14 2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____EEE_____ DEPUTY

**UNITED STATES DISTRICT COURT CENTRAL
DISTRICT OF CALIFORNIA**

CV22-4929-DMG-PD

Civil Action No. _____

|  |  |
|---|---|
| Jeremaine Robert Cathey,<br><br> Plaintiff,<br>v.<br><br>Gary Garcia, in his capacity of principal of John Marshall High School,<br> and<br>The Los Angeles Unified School District<br><br> Defendants | **COMPLAINT FOR**<br><br>(1) Violation of Title VII of the Civil Rights Act of 1964<br>(2) Intentional Infliction of Emotional Distress or in the alternative Negligent Infliction of Emotional Distress<br><br>(3) Violation under the Equal Protection Clause<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

1. The Plaintiff Jeremaine Robert Cathey, hereinafter the "Plaintiff" files this Complaint against the Defendants Gary Garcia, in his capacity of principal of John Marshall High School, and the Los Angeles Unified School District (hereinafter the "Defendants") and further states as follows:

**INTRODUCTION**

The facts of this racial discrimination and harassment case are as complex and overlapping as the employment structure the defendants have fabricated. According to Plaintiff Jeremaine Robert Cathey, Principal Gary Garcia, in his capacity as principal of John Marshall High School California ( hereinafter "the School") where Plaintiff worked as a Special Education Assistant/Visually Impaired Specialist from January 2008 through January 2021—was a hotbed of racial hostility where the Plaintiff and other witnesses frequently heard and was at the receiving end of being called the N-word from students whom were all subjected to the racial verbal slurs and hate vandalism spray painted on the walls of the school, inclusive of being subjected to racial micro-aggressions from these students.

2. Plaintiff Jeremaine Robert Cathey, also brings harassment and discrimination claims against the Los Angeles Unified School District which Plaintiff also was employed from June 1999 to January 2021. From this case, the Plaintiff aims to highlight the manner in which the Defendants allowed students wide spread usage of the N-word coupled with acts of vandalism with hate graffiti of racial slurs; the Plaintiff further aims to highlight to this Court that the Defendants allowed the student's behavior to percolate on campus for several years.

**The Plaintiff**

3   The Plaintiff Jeremaine Robert Cathey, at all times preceding this Complaint is a resident of the State of California who served as a Special Education Assistant/Visually Impaired Specialist from January 2008 through January 2021 . Was employed with Los Angeles Unified School District (LAUSD) for 20 years (6/99- 1/2021. The Plaintiff Jeremaine Robert Cathey, was one

of the few if not only African American teachers that was an employee of the School

**The Defendants**

4.  John Marshall High School is a public high school located in the Los Feliz district of the city of Los Angeles at 3939 Tracy Street in Los Angeles, California. The High School serves grades 9 through 12, and is a part of the Los Angeles Unified School District. Principal Gary Garcia, who is a named Defendant in his professional capacity, serves as the principal of the John Marshall High School and he has oversight over the other administrators inclusive of teachers, security, support staff etc. and the general operation of the school's authority over students during public school sessions. The ethnic ratio of John Marshall High School is comprised of a student body that is predominantly latino with a low percentage of African American/Black students. The faculty is made up of mostly white, and latino, with a small percentage of black professionals with administrative level positions. Mostly janitor, security, and paraprofessionals are held by black staff members, inclusive of the School's kitchen. The administration and the faculty of John Marshall High School are predominantly white and latino since Plaintiff's tenure at the School.

5.  Defendant The Los Angeles Unified School District is a public school district in Los Angeles, California, United States. It is the largest (in terms of number of students) public school system in California and the 2nd largest public school district in the United States.

## JURISDICTION AND VENUE

6.  Jurisdiction is proper in this case as the US District Courts shall have subject-matter jurisdiction to hear a civil cases alleging violations of the

United States Constitution, federal law, or a treaty to which the United States is a party. Jurisdiction is therefore proper under 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the relevant period, Defendants., resided, transacted business, were found, or had agents in this District.

## FACTUAL ALLEGATIONS

8. The Plaintiff Jeremaine Robert Cathey (hereinafter "the Plaintiff") is an African American male, who has been employed as a Special Education Assistant/Visually Impaired Specialist at the LAUSD district for 20 years, and 12 years at Marshall High School (1/2008-3/2020), making Plaintiff the record holder for the longest employed African American Male ever in the School's history.

9. The Defendant Los Angeles Unified School District at all times preceding this Complaint had oversight over John Marshall High School  inclusive of the acts of its employees. inclusive of students as well and a responsibility to create a safe environment free from racial discrimination and racial hate.

10. The Plaintiff states that he is one of the few African American employee at the School and for several years the Plaintiff has been the victim of discrimination through disparate treatment predicated  by administrators of the School.

11. The Plaintiff states that many of the Defendant's actions towards the Plaintiff have not only been discriminatory in nature but also retaliatory as the Plaintiff has been the whistleblower to several instances involving students at the school, which instances were in part racially motivated, in a flagrant attempt to belittle plaintiff, albeit through the Defendants both

creating and maintaining a working environment that was discriminatory for African Americans, primarily the Plaintiff, dedicated Special Education Assistant/Visually Impaired Specialist of the School.

12. The Plaintiff states further that his duration as an African American employee of the School endured for 12 years and that Plaintiff has observed the span three principal administrators to the School, all of whom have allowed the same discriminatory and hostile environment at the school to survive.

13. The Plaintiff herein further provides incident reports of the racial discriminatory predictions (also provided Notarized and as Exhibits) which illustrates the incidents which have transpired over the years, spanning three principals, representing the Defendants' continuous and systemic racial discriminatory conduct towards Plaintiff, from which a disparate impact was sustained by Plaintiff, to wit,

**Incident#1 2017—current**

14.    On Principal Gary Garcia's first day, Plaintiff approached Principal Garcia to inform him about the problems circulating around the School's campus and also what was being ignored by the previous administration's neglect and malfeasance, mainly the use of the "N-word" in reference to African Americans and the depictions of hate graffiti which surpassed 1st Amendment barriers of protection and which the previous administration did nothing to cure, as well as the lies which the School's administration continuously perpetuate concerning black and/or African American history in the history books promoted by the School, which is practically forced on the curriculum to willfully disseminate false information concerning Plaintiff's culture, on students.

15.   Plaintiff states further that Principal Garcia  asked Plaintiff what he was doing when he heard the " N word" being used in common every day speech  and Plaintiff informed Principal Garcia that Plaintiff would inform the students "to use another word", and that Principal Garcia's response was to " keep doing what you're [Plaintiff] was doing".

16.. Plaintiff states that nothing was done to remove the pre existing racial prejudice that permeated throughout the school that was existent through the prior administration, but instead the present administration maintained the long standing racial prejudice against African Americans, inclusive of the Plaintiff, one of the few African American employees of the School, which is  but of a handful in comparison to the hiring practices of the school. Plaintiff states particularly that he was one of the three male black employees, and that the Defendants  produced a racial highlighted environment in which Plaintiff's actions were regularly placed under the microscope. The Plaintiff adds that the  Defendant displayed no concern whatsoever for the racial divide which it unilaterally created and did nothing to stop the continuous and systemic hate crimes that have had a disparate impact on the Plaintiff who was eventually psychological tormented to the point of him leaving his job and because he the Plaintiff had become a whistleblower against the Defendant, in defense of youth attending the School who experienced similar hate crimes and far worse, including of Plaintiff's whistleblowing efforts exposing the Defendant to covering up reports of physical abuse, racially motivated acts of vandalism, inclusive of graffiti and other utterances being turned a blind eye to, by the administration of the School and a sleuth of other racially driven cover ups which the present administration did nothing to cure.

**Incident #2 (end of 2017 school year)**

17.   Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

18. Plaintiff states that during the above-stated time frame, the students repeated the same behavior that they exhibited when the previous administration was in control, and again, by way of a "senior prank" the students thought it was funny to vandalize the school with Hate graffiti, with racial epitaph inclusive of usage of the word "Nigger" and "Coon"!

19.   The Plaintiff states the administration's response during this time was near the same as the preceding administration; the Plaintiff states the administrators contacted the painting crew in the early of the morning to cover up the Hate Graffiti, creating the false belief that the occurrences never happened. As if there isn't a racist presence and environment on that campus, this was the second or third time in a row of Hate Graffiti being illustrated on Campus, yet School administrator's did nothing.

20. . The Plaintiff states that he met with the then principal to suggest some repercussions and was informed that " a few bad apples couldn't ruin the graduation festivities", because Plaintiff wanted the senior picnic cancelled. The then principal proceeded to inform Plaintiff that "the N-word with the "a" nigga was socially acceptable because of the movies and music" falsely pushing this view as an albeit wrongful attempt to desensitize the public from use of the "N" word as being a derogatory slur. Plaintiff states that he knew right then the ignorance which Plaintiff was up against, and that the Principal was not going to do anything for the Plaintiff because he [the Plaintiff] had broken code on being a whistleblower to instances of child abuse occurring throughout the School.

**Incident#3 (2018 school year, dated with EEOC reports)**

21. Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

22.. Plaintiff states that while he was walking to his lunch location he noticed the security chasing a student out of class who was walking in the Plaintiff's direction; the Plaintiff informed the student to turn around and go with the security. Plaintiff states that as he and the student were walking up toward the office, that the student called the Plaintiff the "N" word. Plaintiff states that he continued escorting the student to Mr. Flores' office ( who was the same administrator which Plaintiff reported was engaged in child abuse of a student) and upon Plaintiff's relieving himself, the said student was sent back out to the cafeteria with no disciplinary action taken against the student whatsoever. Plaintiff states that no more than five minutes later, the student returned to Plaintiff with the same harassing efforts towards Plaintiff.

23. The Plaintiff states that complained to administration and was informed that there was nothing the administrators could do, and that it was district policy along with a post stating "nothing I can do" signed by the administrator Flores on Plaintiff's sign in sheet.

24. The Plaintiff states that thereafter he called the School District on his own accord and started complaining about the administration and their lack of help. During this time, the Plaintiff now being intimidated by the student and his Armenian male friends (the same ones who segregate themselves in "their" spot on campus) essentially started following and harassing Plaintiff everywhere Plaintiff were to traverse on Campus even while Plaintiff was aiding vulnerable visually impaired students.

25..  The Plaintiff states that he spoke to both Garcia, and Flores in the hallway about the intimidation and was informed by FLores "tell those punks to take a picture it will last longer", as Garcia stood silently; the Plaintiff states that he emailed Garcia to speak with him privately regarding Flores' disregard for Plaintiff's safety and still nothing was done. Finally, the behavior was witnessed by a teacher who observed the students intimidating the Plaintiff , and she confronted the student who had called Plaintiff the "N" word. As said student started to disrespect her and call her names the Plaintiff endeavored to diffuse the situation by asking the student to just go to class, and the student in return proceeded  to ball his fists and inform Plaintiff that he was going to "Beat my ass" [in referring to Plaintiff]. The Plaintiff states further that several teachers wrote letters on Plaintiff's behalf, and wrote how this student was also harassing them constantly out of class etc.

26.    The Plaintiff states that he kept calling the School District, until  they forced the administration to follow procedure by way of removal action against the student. The Plaintiff states that had the School District not been essentially pressured to intervene that the student would have stayed and the administrators of the School particularly would have allowed the student's racial bigotry, hate speech and outright harassing and disrespectful efforts to continue.

27.    The Plaintiff states that he eventually filed an EEOC report which came back with several falsifications concerning Plaintiff with which the Plaintiff felt severely biased. Plaintiff states that the EEOC report stated that Plaintiff was a "civil rights' fighter, and that Plaintiff did not accept any apology at least 3-4 times when in fact, not even a single apology was rendered and that further, when acceptance of any apology was not  mandatory and served no relevance to the Compliant other then to characterize the Defendant. Plaintiff states that the report was further full of bias

and gave the school a glowing report while simultaneously making Plaintiff look like the problem.

28.  Plaintiff states that he eventually filed an EOS investigation on the EEOC and that investigator who rendered the false report.

**Incident#4 (2018-19 school year) witnessed by Mr.. Villapondo**

29.   Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

30..      Plaintiff states that one day, while sitting outside having lunch with a friend, that two heavy set latin-American individuals came towards Plaintiff and essentially hovered with clutched fists talking about "why did I call his mom a bitch?" Plaintiff states that he had never before seen these kids and as such, Plaintiff did not know what they were referring to. Subsequently and instinctively, the Plaintiff rose to defend himself and upon seeing that the individuals fled and Plaintiff and his friend proceeded to follow the individuals to have them proceed to the office. Plaintiff states that while on the way to the office that he and his friend passed the principal and the security who both asked what was going on. The principal ordered the security to apprehend the fleeing individuals who eventually ran faster than they could be caught. Plaintiff states that the principal then proceeded to inform the Plaintiff "oh they must be on drugs," (this statement was made because the principal is aware of the amount of drug use/selling on campus); the Principal then acted as if nothing transpired and informed Plaintiff merely to write the Principal a statement. The Plaintiff states that there was no following up on this incident after the incident had occurred and a statement provided.

**Incident#5 (March 3. 2020)**

31.    Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

32.    Plaintiff states that he was walking to his next assignment he saw the principal and wanted to speak with him regarding some of the issues the Plaintiff had been emailing him about. Plaintiff states that as he went in the Principal's direction to catch up to him, the Plaintiff passed by a female security dealing with some combative students resulting in Plaintiff having to stop just to be another presence so she wouldn't be alone, (this security had secretly told Plaintiff previously that she had been threatened by a student and asked Plaintiff advice on how to remove the other student who called Plaintiff the N word).

33.    Plaintiff states that as the student became more aggressive to the security, the Plaintiff stepped in and asked the student to come with her to the office. The student became extremely belligerent and physical (by invading Plaintiff's space with her middle finger raised millimeters from Plaintiff's face while screaming "Fuck You" in the process and through twisting hr hands and fingers in gang signs). Plaintiff asserts that the principal was about 20 feet away observing the altercation with another security guard (which they have denied). Plaintiff states that at that juncture, the situation escalated with a group of hispanic males (about 4-5) whom were out of class, starting to yell "Fuck that Nigga!" repeatedly. The principal, rather than address the students, approached the Plaintiff for yelling, as the kids are walking away yelling "Fuck that Nigga!" and twisting their fingers in the air.

34.    Plaintiff states that he then went to his next assignment only to encounter a group of students (possibly the same students as highlighted in the preceding paragraph) who were in the back pointing and whispering, creating intense feelings of discomfort experienced by Plaintiff, to the extent that that Plaintiff had the

teacher address these students. With the whole ordeal becoming too stressful the Plaintiff felt obligated to remove himself from the harsh environment entirely.

35. Plaintiff states that he immediately went upstairs, collected the items from his desk and went to his supervisor to inform her of all of the events that transpired and the reasons for his intentions not to return. Plaintiff states that his supervising teacher was in the office in tears trying to convince Plaintiff to stay and she went to confront the principal; when she returned, she informed Plaintiff and others present that the principal blamed the Plaintiff for the incident because, "Plaintiff shouldn't talk to kids that the Plaintiff did not know"...which Plaintiff remained completely unawares that this was the policy in a school environment setting where teachers had authority over the students. The Plaintiff at this juncture was left puzzled as to how Plaintiff was to handle emergency situations if the policy was that Plaintiff was prohibited from speaking to students that Plaintiff did not know. The Plaintiff states further that this supposed "no talk" policy had never been expressed in any previous staff meeting.

36. Plaintiff states that his supervising teacher said from the conversation that she just had with the principal that it was best for the Plaintiff to leave, which Plaintiff did.

37. The Plaintiff, at this juncture filed another EEOC report, which they assigned the same investigator that was biased in the first report. Plaintiff states that he requested a change in investigator and they denied Plaintiff's request, so Plaintiff did not participate in the investigation. Consequently and to no surprise to Plaintiff, the investigator found no wrong doing on the part of the School, claiming that no one witnessed anything.

**Incident#6:**

**38.** Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

**39.** Plaintiff states that while he was on workman's compensation, the Plaintiff I was still trying to pursue the district to admit their covering  up of child abuse. Plaintiff wanted to see if they would actually terminate Plaintiff before they terminated Mr. Flores ( who, from Plaintiff's understanding has an extensive disciplinary and investigative file against him). Plaintiff states that he began sending emails and making phone calls informing everyone in the district that Mr. Flores hit a student and sent the student to jail who was looking for assistance., Plaintiff states that he called all of the Board members and didn't receive any assistance. Finally, Plaintiff raised enough concerns to where the District said they were going to "investigate" and that further, the Plaintiff should cease and desist, which Plaintiff did not do but rather took action in emailing a certain group of racist teachers and called them names (nothing they hadn't already been called by others), and this group of teachers banded together and petitioned the principal to create a safety/emergency plan against Plaintiff because they were purportedly afraid. Plaintiff submits as evidence, hereto attached as Exhibit _____,  the email sent to the Plaintiff by a co-worker claiming they were afraid.

**Incident#7**

40.   Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

41. Plaintiff states that there were numerous times in classes where kids have exclaimed  just yelling across the room..."Fuck you nigga!" then the whole class would get quiet and everyone would turn and look at Plaintiff . When Plaintiff asked why they were looking at Plaintiff? no response was provided. Plaintiff

states that he informed his supervisor that he  refused to work in those classes.
Plaintiff states further that he  had two teachers write apology letters for the
behavior, as well as one teacher who was so annoyed by a white student's use of
the word, that said teacher met with me because he wanted to report it to the
administration to have it dealt with, as well as Ms. Fefferman who would stop her
classes to give lectures because the use of the word was overwhelming. Plaintiff
states that now, well after he has removed himself from the hostile environment
created by the School, the principal  made a video about the use of the N word, but
6 years ago he ignored Plaintiff altogether and every instance where the word was
used in the past was ignored.

**Incident#8: March 6, 2020**

**42.**    Plaintiff restates the facts and allegations in the preceding paragraphs and
further states as follows:

43.. Plaintiff states that 3 days after Plaintiff brushed off being called the N word
repeatedly with no consequence, the district sent out a district wide email, to every
staff regarding the use of the phrase "China Flu" and how it was prohibited from
being used because of cultural sensitivity, yet at the School, the use of the N Word
was used for years without being checked in a similar fashion. Plaintiff states that
this email infuriated Plaintiff and there have been other instances of the "N word"
being used in regular campus-wide derogatory speech with other teachers getting
into fights over the N word as they knew the N word was more harmful than
anyone being abused by the "china flu", but no district wide email was ever sent
concerning the use of the N Word. The Plaintiff states that they placed the Plaintiff
in the same position even after there was no "N word training".! The Plaintiff was
told that the cultural sensitivity statement has always been in effect so Plaintiff
asked them how come the N word did not get the attention the "China flu" received

when there were no cases of violence regarding "china flu" reported. Plaintiff states that this was all a political endeavor to achieve a desired aim for a particular ethnic group of individuals

https://youtu.be/xO5zr5wcDMk

**Incident #9**

**44..** Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

45. Plaintiff states that on the morning of Kobe Bryants death, the english teacher Mr. Banks gave his students and assignment to remind them that Kobe Bryant was a rapist. He gave them a link to read from the LA Times, an opinion column written by a racist feminist but it was not an educational article, it was a biased hit piece. Plaintiff then received an email from a friend informing Plaintiff that the other teachers had heard about the incident and sent an email to the principal to cover it up because it had been leaked to social media and the reputation of the school would be negatively publicized. Plaintiff states that there was no cultural sensitivity in the email just concern for reputation and the students were pissed and put the assignment on social media. Plaintiff confronted the principal who told Plaintiff that he hadn't even looked at the article but he told the teacher to take it down and it was handled, and Plaintiff remembered when he was the subject of a 4 month investigation for stating that Egypt is in Africa and it's teachings was stolen by Europeans.

46. Plaintiff states that he had reported this same teacher as well for his "BLACCENT" which was like blackface without the make-up as he read the book "Their Eyes watching God". Plaintiff states that the characterizations of the Black males in the book were racial stereotypes and during class he would ask them to do

a character assessment, and every black man they would say"playa", "pimp", then the teacher would respond, "yea he is pretty much a playa pimp", as Plaintiff, the only black male sat and had to listen in the corner, yet they forget to remind the students that the only reason why the men in that book speak that broken uneducated english is because john marshall hid their original language from them and on top of that refused to let them get educated or read for generation after generation. Plaintiff states that these facts are left out. Plaintiff states at this point Mr. Banks, perhaps desirous of payback, wrote that email to the principal for a safety plan against Plaintiff to essentially get Plaintiff off of the campus as retaliation for standing up against Mr. Banks.

**Incident#10**

**47.** Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

48.  Plaintiff states that a visually impaired student approached Plaintiff and asked whether Plaintiff could escort him to the pep rally because he was afraid. Plaintiff then asked him why and he proceeded to tell Plaintiff at a previous pep rally he joined a group of students in taking a knee during the national anthem in solidarity with the black movement and he said they were threatened to be taken to the Dean, and that he felt safe with Plaintiff. Subsequently Plaintiff took the visually impaired student as he could do his demonstration of taking a knee and when they arrived, the  Plaintiff informed Julio that there were other ways to protest so that he would not bring too much attention to yourself, but that he still did his part; Plaintiff suggested that both him and the visually impaired student (Julio) just turn their backs to the flag, and  that Plaintiff and the student achieved. Plaintiff states that as him and the student were turning around there were two male European teachers against the fence to Plaintiff's right, laughing and mocking the take a knee

protest and talking about disrespecting the flag. Plaintiff states that he kept his composure but finally saw these teachers for who they were and it confirmed the attitude that the student, Julio had previously witnessed. Plaintiff asserts that these are the people writing safety plans for Plaintiff, while they aim to scare innocent blind special ed. students with their racist threats and that further prevented and intimidating students from practicing their First Amendment Rights. Plaintiff adds further that the intimidation that Plaintiff received for being a whistleblower kept Plaintiff from performing Plaintiff's job to his full capacity and also made Plaintiff fearful to ever report a child abuse incident again, in which Plaintiff is entitled to do as a mandated state reporter, but because of the fear and intimidation which Plaintiff systematically experienced, the Plaintiff failed to report all of the incidents of child abuse he observed, for ultimate fear of retaliation. Plaintiff states that by not acknowledging the seriousness of the racial issue and environment on campus, the administration was denying the African American population on campus access to the mental health services which they needed to deal with the underlying racial environment that really existed. Furthermore, for those who were directly exposed and traumatized by the racist environment (N-word, physical threats of harm, and racist hate graffiti), no corresponding services were offered. Plaintiff adds that from a practical standpoint, when issues like suicide occur that has the ability to traumatize the campus the Defendants would assign a Mental Health clinic, but this was not the case for uses of the N Word, hate graffiti and other atrocities that are brushed off as being insignificant. In fact, Plaintiff alludes to the Court that in the School environment there was a school of thought, albeit an offensive one that when writing out the N-word, it was advised to spell it "Nigga/er", so it can be perceived that there was no difference.

49. Plaintiff asserts that because of the foregoing instances that he asserts a claim for  damages in the amount of $5,000,000.00 and other relief, and as cause(s) of action, Plaintiff further states as follows:

## FIRST CAUSE OF ACTION

## Violation of Title VII of the Civil Rights Act of 1964

## On the Grounds of Adverse Impact and Perpetuation of Past Discrimination

## As Against All Defendants

**50.** Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

**51.** Title VII is a provision of the Civil Rights Act of 1964 which prohibits discrimination in virtually every employment circumstance on the basis of race, color, religion, gender, pregnancy, or national origin. In general, Title VII applies to employers with 15 or more employees. The purpose of Title VII's protections is to "level the playing field" by forcing employers to consider only objective, job-related criteria in making employment decisions. The above classes of individuals are considered "protected" under Title VII because of the history of unequal treatment which has been identified in each class.

52. Plaintiff states that against this backdrop of the above,  that a hate crime is a crime motivated by prejudice toward the "victim's race, color, ethnicity, religion, or national ori- gin." BLACK'S LAW DICTIONARY 378 (7th ed. 1999). Hate Crimes Law. The best way to distinguish hate crimes is to highlight how they are different from non-bias-motivated incidents. Hate or bias crimes" are not committed because of animosity towards the victim as an individual, but rather because of hostility to- ward the group to which the victim belongs. Troy A.

Scotting, Hate Crimes and the Need for Stronger FederalLeg- islation, 34 AKRON. L. REV. 853, 856-57 (2001). The prejudice which motivates the commission of a hate crime may be based on the victim's actual or perceived race, religion, ethnicity, or sexual orientation. While whether the use of the N word generally may not be perceived as a hate crime in the continental United States or may be debated to be, when use of the N word is applied by our nation's youth in a School setting and is repeated to African American teachers by students in a School setting the line must be drawn somewhere,, and checks and balances should be placed on the very public institutions that continuously and systematically harbor this type of conduct with no disciplinary action being taken by School administrators whatsoever.

53. Plaintiff asserts that as a public policy matter, this lack of attention by School administrators creates a situation where our nation's youth are then unleashed into the real world with the false and mistaken belief that they could predicate these racially motivated acts of hate through racial slurs  and acts of vandalism perpetuating these prejudices to average members of the public, in the work place, to public officials and even one day to judges of this very Court if put into such a position.

**Adverse Impact**

54. Plaintiff asserts that in 1971 in Griggs v. Duke Power Co., 401 U.S. 424,3 EPD ¶ 8137 (1971), the Supreme Court announced the principle that employment policies and practices which have an adverse impact on minorities and women and are not justified by business necessity constitute illegal discrimination under Title VII.  Justifying an employment policy or practice by business necessity involves a showing that the policy or practice is related to performance on the job.  This means, for example, showing that a selection procedure has been validated.

Though not quite a selection-type case here, in an adverse impact charge, the focus of the inquiry is on the consequences of employment practices rather than the motive. The Plaintiff oes not have to prove that respondent's actions were based on a discriminatory motive. He need only establish that an employment practice, even though applied equally to all applicants or employees, has the effect of excluding or otherwise adversely affecting the minority groups in significant numbers.

**Perpetuation of Past Discrimination -**

55. Plaintiff asserts that this type of discrimination occurs when the effect of past discrimination is being continued by the present operation of a neutral employment system. Commission Decision No. 72-0265, CCH EEOC Decisions (1973) ¶ 6291; Patterson v. American Tobacco Co., 586 F. 2d 300, 18 EPD ¶ 8691 (4th Cir. 1978). The employment system is neutral if it applies to all applicants or employees and is applied evenhandedly to all. The perpetuation of past discrimination theory is similar to the adverse impact theory in that neither theory is concerned with the respondent's present motivation. There is no requirement that the Plaintiff prove the presence of a discriminatory motive. However, past motive may be highly probative, and should be looked for in a perpetuation case (bearing in mind, of course, that direct evidence of past discriminatory motive is not required

**Proof of Perpetuation of Past Discrimination -**

56. The Plaintiff can establish a prima facie case of discrimination by proving that past discrimination occurred and that it is being continued by the present operation of a neutral employment system. The past discrimination could have occurred before or after the effective date of Title VII. The neutral employment system will

generally be a wage, pension, or seniority system, although it can be any policy or practice that operates to freeze the effects of prior discriminatory practices. In proving a charge alleging perpetuation of past discrimination, the charging party must demonstrate a causal connection between the past discrimination and the current policy's adverse effects.

**Penalties for non-compliance**

57. Plaintiff asserts that for intentional discrimination, employees may seek a jury trial, with compensatory and punitive damages up to the maximum limitations established by the Civil Rights Act of 1991 according the employer's number of employees: 15-100 employees, a maximum of $50,000; for 101-200 employees, a maximum of $100,000; for 201-500 employees, a maximum of $200,000; and for over 500 employees, a maximum of $300,000. Remedies of back pay, reinstatement, and retroactive seniority are available for all types of discrimination, whether intentional or disparate impact.

**This Court Has Held That But-For Causation Is The Default Rule For Federal Discrimination Laws**

58. Notwithstanding the foregoing, the Court has already held that, when Congress legislates, it does so according to certain "default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself." University of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 347 (2013). This includes the "background" principle of "[c]ausation in fact": the requirement that a plaintiff offer "proof that the defendant's conduct did in fact cause the plaintiff's injury." Id. at 346-47. Causation in fact, or "but-for" causation, "retains a secure position as a fundamental criterion of tort liability" because it is a "factual, policy- neutral inquiry." Richard W. Wright, Causation in Tort Law, 73 Cal. L. Rev. 1735, 1813

(1985); see also Note, Rethinking Actual Causation in Tort Law, 130 Harv. L. Rev. 2163, 2164 (2017) (describing "but-for" causation as the "standard definition of actual causation"). As the Court in Nassar noted, it is "textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" 570 U.S. at 347 (quoting W. Page Keeton et al., Prosser and Keeton on Law of Torts 265 (5th ed. 1984))

**Plaintiff's Argument is support of Title VII Discrimination Claim**

59.   Plaintiff asserts in light of the foregoing that given the facts and allegations as presented through the listing of incidents mentioned in paragraphs 6 through 47, the Plaintiff asserts a claim against the Defendant The Los Angeles Unified School District and Principal of the John Marshall High School who allowed teachers and students alike to perpetuate numerous instances of racially motivated occurrences, which said Defendants did nothing to cure. Plaintiff asserts that the prevalence of these occurrences still exist at the School to this very day and from the facts, the Court would observe has been a past and continuous occurrence, The Defendant The Los Angeles Unified School District is equally to blame for its turning a blind eye to the many reports and incidents mentioned in this Complaint, many of which testimony is included as Exhibits to this, Plaintiff Complaint.

60.   Plaintiff ask this court to see instances as referenced above as having an adverse impact on Plaintiff to the extent that Plaintiff has been psychologically scarred through the countless and systemic abuses which he had to face as a Special Education Assistant/Visually Impaired Specialist and the Defendants' employee, while the Defendants stood idly by and allowed students and teachers alike to predicate their racist ideals in the school setting.

61.   Plaintiff submits proof in the Exhibits that he was also discriminated against through the Defendant's perpetuation of past discrimination stemming from 2008

to 2020 when Plaintiff was practically forced to resign his position as a as a special education assistant; all because of the mental stress and psychological anguish which the Defendants caused through the harboring of a hostile and distasteful and prejudice working environment geared towards belittling African Americans and Africans within the diaspora  as non-human with the use of the N-word implying the excuse for inhumane treatment, negligence, and willful neglect and even physical and mental harm, thus explaining the use of the N-word as not being identified as Hate speech deemed culturally insensitive on the same level as "China Flu" worthy of any mention, with no move to action (as in the May 6th email protecting Asian hate and "China Flu"), and/or appropriate discipline action to rid the school/working environment of any and all current and potential disruptors to the protected right of African Americans and those within the Diaspora..

62.    Plaintiff in light of the foregoing claims damages against the Defendants in the amount of $5,000,000.00 and seeks a trial by jury on all issues triable.

## SECOND  CAUSE OF ACTION

### Intentional Infliction of Emotional Distress or in the alternative

### Negligent Infliction of Emotional Distress

### As Against all Defendants

63.  Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

**64**. A cause of action for intentional infliction of emotional distress arises when a defendant intentionally or recklessly causes severe emotional distress to another by extreme and outrageous conduct. See Unterberger v. Red Bull North America, Inc.. 162 Cal. App. 4th 414 20 (2008). To plead a cause of action for intentional

infliction of emotional distress, a plaintiff must allege: (1) extreme and outrageous
conduct by the defendant with the intent to cause, or reckless disregard for the
probability of causing, emotional distress; (2) suffering of severe or extreme
emotional distress by the plaintiff; and (3) the plaintiff's emotional distress is
actually and proximately the result of defendant's outrageous conduct. See Chang
v. Lederman, 172 <u>25 Cal. App. 4th 67, 86</u> (2009).

65. Although there is no independent tort of negligent infliction of emotional
distress, California recognizes a right to recover damages in a negligence action for
serious emotional distress. Gu v. BMW of North America, <u>132 Cal. App. 4th 195,
204</u> (2005). Since the tort is negligence, duty is an essential element. See Potter v.
Firestone Tire & Rubber Co., <u>6 Cal. 4th 965, 984</u> (1993). However, there is no duty
to avoid negligently causing emotional distress to another. Id. Therefore, "unless
the defendant assumed a duty to plaintiff in which the emotional distress of the
plaintiff is an object, recovery is available only if the emotional distress arises out
of the defendant's breach of some other legal duty and the emotional distress is
proximately caused by that breach of duty." Id. at 985; Gu, <u>132 Cal. App. 4th at
204</u>. The requisite duty "may be imposed by law, be assumed by the defendant, or
exist by virtue of a special relationship." Potter, <u>6 Cal. 4th at 985</u>.

**1) extreme and outrageous conduct by the defendant with the intent to cause,
or reckless disregard for the probability of causing, emotional distress;**

66.  Plaintiff, for this element restates the facts presented at paragraphs 6 through
47, by the myriad incident reports that occurred during Plaintiff's time as a teacher
at the School, which Plaintiff sets out to illustrate the level and intensity of the
conduct which the Defendants allowed to occur for years and still allows to occur
well after the Plaintiff no longer is employed at the School as  a special education
assistant/Visually Impaired Specialist.

**(2) suffering of severe or extreme emotional distress by the plaintiff;**

67.  Plaintiff, for this element states that he has had sleepless nights, suffers from restlessness and other feelings of pressure on his nerves because of the psychological impact from the hostile and racially charged environment which the School had created and never sought to cure. Plaintiff states that he at times has severe feelings on anxiety, loss of enjoyment of life and mental anguish;Plaintiff has also experienced harm to his reputation and strained relationships with his family and friends

68. Plaintiff states that the Defendant Los Angeles Unified School District is equally to blame for the state of mental anxiety which the Plaintiff experiences on a daily basis through their outright failure to quell the incidents at the School that were committed through racially motivated ideals inclusive of Hate Crime driven thought processes.

And

**(3) the plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct**

68.    Plaintiff, as for this element states that there were no other factors that contributed to his  mental anxiety, but for the environment created by the Defendants. Further it was reasonably foreseeable, from the Defendants continuous and systemic actions, highlighted  at Paragraph's 6 through 47 that the emotional distress suffered by Plaintiff was more than likely to occur as a result of the Defendant's actions over a sustained period of time. The Plaintiff states that principal Gary Garcia should have known of all of the pre-existing racially motivated course of events that occurred prior to his taking office, yet he did nothing in his capacity to alter or even lessen the damaging effect of the racial

actions and hate crimes perpetrated against the Plaintiff. The Plaintiff adds that
Principal Garcia at the very least,  should have known  prior to taking his position
with the Racial Hate graffiti being done the previous year, but yet despite being
informed on his first day of taking his position as principal, nothing was done to
improve the racial tension at the school.

69.    Plaintiff in light of the foregoing, and for this cause of action, seeks  damages
in the amount of $5,000,000.00 for the Defendants collective Intentional Infliction
of Emotional Distress.

## THIRD CAUSE OF ACTION

## Violation of the Equal Protection Clause (5th and 14th Amendments to the US Constitution)

### A  Civil Wrong

### As Against the Defendant Los Angeles Unified School District

70.    Plaintiff restates the facts and allegations in the preceding paragraphs and
further states as follows:

71.    The Equal Protection Clause of the 5th and 14th Amendment to the U.S
Constitution prohibits states from denying any person within its jurisdiction the
equal protection of the law. In other words, the laws of a state must treat an
individual in the same manner as other people in similar conditions and
circumstances. A violation would occur, for example, if a state prohibited an
individual from entering into an employment contract because he or she was a
member of a particular race

**72.**  Notwithstanding the foregoing, the Supreme Court's plainest description of a
cause of action came in *Davis v. Passman*. 442 US 228 (1979). In that case,
Shirley Davis sought damages from Representative Otto Passman for a violation of

her right to equal protection under the Fifth and Fourteenth Amendments. Id. at
230–31, 242. Id. at 230–31, 242. As part of its analysis, the Court defined the
concept itself. A cause of action exists, the Court explained, if the "plaintiff is a
member of the class of litigants that may, as a matter of law, appropriately invoke
the power of the court." With the ability "to invoke the power of the court," Davis
also makes clear that there are two ways to create a cause of action.

73.     First, Congress might create one itself. In enacting a statute, Congress
might bestow on those who are injured by the violation of the statute the power to
seek relief from the wrongdoer. However, Congress can create causes of action for
reasons other than to enforce statutory violations. Congress is free to create them in
the constitutional realm as well, as it did with the so-called § 1983 action.
Nevertheless, if Congress does not create a cause of action, the federal courts may
do so. Such causes of action are known as "implied causes of action" Id. because
the mere existence of a right implies, in some sense, their existence. Although
Davis is only a single case, both courts and scholars have frequently relied upon its
formulation of the cause of action. Moreover, neither courts nor scholars have ever
discredited the formulation.

74.     Further, a judicially created cause of action often relates closely to rights.
When federal courts are faced with the question of whether to create a cause of
action, they often look for the cause within the right itself. Federal courts have
found a cause of action to enforce one's due process rights "implicit in the Fifth
Amendment" or to enforce one's right to humane treatment in prison "implied . . .
from the Eighth Amendment." Id.

75.     In sum In determining whether to imply a cause of action, the federal courts
look to "congressional intent to provide a private remedy." Similarly, the
availability of a cause of action often turns on the nature of the remedy sought.
See. Va. *Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991)).

76.. Plaintiff restates the facts and allegations in the preceding paragraphs and further states as follows:

**77.** Plaintiff for this cause of action accuses the Defendant Los Angeles Unified School District of doing business with a racist third party corporation and using taxpayers money to purchase school books from a company that promotes, through its literature, anti-black content for the District's widespread use on its curriculum.

78.    Plaintiff asserts that it is the information in the school book that perpetuates the degradation of Africans and that causes students to become cognitive dissonant to the point that the anti-blackness overpowers truth. Plaintiff states that the publishers of the history books whom the District contracts with also promote History.com., which organizers invented a make believe ancient alien theory to cause confusion and to offer the anti black racists a non excuse to illustrate for example Aliens being the builders of the pyramids where intentionally implanting the idea of in the African American student that Africa did not have a glorious past. Plaintiff states further and by way of illustration that the math books are full of plagiarism denying Plaintiff's culture its rightful notoriety and acclaim; the math books claim pythagorus invented the theory known as " the pythagorus theorem" when in actuality, African mathematicians already had invented geometry , calculus and mapped the stars.

79.     Plaintiff states that it is the District through its continuous support and purchase of the anti-black literature from third parties which has further perpetuated such anti black rhetoric and lies espoused by the publishers of these books; the District further enforces the teachers, and Plaintiff, himself an African American to "stick to the curriculum" which is laden with false and racially biased content. The Plaintiff adds that it is this type of (mis) information within these

textbooks that are in turn parroted by teachers of LAUSD and which has caused students psychological trauma to the point that even Plaintiff could not process accurate historical African information. The Plaintiff states that even students (who might not have known better) attempted repeatedly to endeavor to have Plaintiff investigated and silenced to the point of termination, over statements of fact regarding plaintiffs Ancient African Egyptian Lineage.

80.     As a result of the foregoing, the Plaintiff asserts a claim for punitive damages against the Defendant Los Angeles Unified School District for the amount of $1000,000.00 for the District's violation of Plaintiff's Equal Protection Rights

### RELIEF SOUGHT

**81.     WHEREFORE,** Plaintiff, , acting as a self represented litigant, ( "the Plaintiff") do hereby requests the following relief from this Court:

1. That this Court award Plaintiff damages in the amount of $5,000,000.00 for the Defendants' Title VII violations.

2. Award Plaintiff Damages in the amount of $5,000,000.00 for the Defendant's Intentional and/or Negligent Infliction of Emotional Distress

3. Award Plaintiff Damages punitive damages against the Defendant in the amount of $300,000.00 or as the Court sees fit, for the Defendant Los Angeles Unified School District's Equal Protection violations

4. Plaintiff also requests an award for Costs of Suit.

5. Plaintiff further requests a jury trial on all triable issues.

Plaintiff requests total damages in the amount of $10,300,000.00

Respectfully Submitted

Jeremaine Robert Cathey
Plaintiff, Pro Se
Address for Service
2435 1/2 Shoredale ave
Los Angeles CA 90031
**wayz2win2022@gmail.com**


Dated July___1/___ 2022

